Filed 6/29/22  P. v. Rollins CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>PHILLIP MARTE ROLLINS,<br><br>      Defendant and Appellant. | A161024<br><br><br>(Contra Costa County<br>Super. Ct. No. 051822048) |

This is an appeal from judgment after a jury convicted defendant Phillip Marte Rollins of one count of making a criminal threat while armed and one count of attempted false imprisonment.  Defendant received three years of probation, a condition of which was serving 180 days in jail.  On appeal, defendant contends that the trial court misinstructed the jury on the offense of making a criminal threat, the trial court failed to give a required instruction on jury unanimity, his attorney rendered ineffective assistance by misstating facts during summation, and a change in law requires a reduction in the length of his probationary term.  We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

On November 26, 2018, defendant was charged with making a criminal threat (Pen. Code, § 422, subd. (a); count 1)[1] and false imprisonment by violence (§§ 236, 237; count 2). As to both counts, it was alleged defendant personally used a firearm (§ 12022.5, subd. (a)). A jury trial revealed the following facts.

### I. Prosecution's Case.

Defendant lived with the victim and her young daughter from 2015 to 2017 in a single-family home in Richmond. Their relationship was marred by several incidents of violence. One time, defendant became enraged when the victim's cousin knocked too loudly on the door. After the cousin left, defendant demanded that the victim and her daughter get in the car so that he could take them to the victim's uncle's house. Both females were scared and did not want to go. During the drive, defendant threatened to shoot at the house and, later, threatened to kill the victim.

Another time, the couple argued in the living room until the victim retreated to her daughter's room and shut the door. Defendant opened the door and grabbed her arm, pulling her from the room. In doing so, the victim tripped and hurt her ankle.

In June 2017, the couple argued in the laundry room. Defendant pushed the victim into the dryer and choked her for over a minute, causing her neck to hurt for several days. About a week later, the victim's daughter told the victim her relationship with defendant was abusive and did not seem right. Shortly thereafter, the victim told defendant he had to move out before the next school year started in August.

---

[1] Unless otherwise stated, all statutory citations herein are to the Penal Code.

In early August 2017, defendant was confronted in his bedroom by the victim's friend Brandon, who demanded that he leave. The victim was in another room. Brandon told defendant he was no longer welcome in the victim's house. Although Brandon used profanity, he was not armed and did not threaten defendant. Defendant took nothing when he left, but he called the victim later to arrange to collect his belongings.

The next day, the victim met defendant and gave him many of his belongings. She also helped him find a new place to live, in a house with several roommates. Defendant was uncomfortable receiving mail at his new address, so he continued to receive mail at the victim's house. She repeatedly asked him to have his mail forwarded, but he did not do so. Although no longer a couple, they continued to meet monthly so defendant could get his mail.

On a Saturday in early February 2018, defendant and the victim planned to meet, but the victim failed to show up at the arranged time. Defendant repeatedly called the victim, but no one answered. Finally, on Sunday, Brandon, who was now dating the victim, answered her phone and said she was busy before hanging up.

The victim and defendant later talked and agreed to meet in the parking lot of a large retail store at 6 p.m. on Monday. The victim arrived with her daughter. The victim handed him his mail and turned to leave, but he told her to stop. Defendant then told her that she could not leave or he would kill her. He then demanded to know who answered her phone. He partially pulled out a handgun for about 30 seconds before giving her a pen and paper to write down the person's name and address.[2] Scared, the victim

---

[2] The victim's daughter did not remember seeing the gun; however, her mother told her that he had one.

3

wrote down a fictitious name. Afterward, defendant told her that she could leave the parking lot but could not go back home. Defendant warned the victim that he had people watching her and if she told anyone he would kill her.

The victim drove away quickly and called Brandon, who instructed her to call 911. This 911 call, recorded on February 5, 2018, was played at trial. In it, the victim reported meeting her ex-boyfriend to drop off his mail at the store parking lot. Her ex-boyfriend, angry that someone else answered her phone, pulled a gun out and (without pointing it) threatened to kill her for "playing games . . . ." The victim described the gun as a black handgun that he pulled out of his pocket. Defendant told her that he had people watching and if she went home or told anyone he would kill her. Afraid, the victim went to her uncle's house.

About an hour later, police interviewed the victim, who described a physically and verbally abusive relationship with defendant. She told the police that she did not want defendant prosecuted but did want him to leave her alone.

Police later interviewed defendant and searched his house. They found an unloaded firearm registered to defendant, two magazines with no ammunition, and a certified record of sale in his bedroom.

## II.    *Defense Case.*

Defendant's friend testified that defendant was "pretty mild-mannered" and not violent-natured. Defendant then testified in self-defense, describing a course of events that differed from the victim's account.

According to defendant, he and the victim mutually agreed to end their relationship in August 2016. Following bouts of infidelity, the couple began living together as "friendly" roommates. In May 2017, the victim told

4

defendant he would soon need to move out and that she would help him do so when the time came.

Around June 2017, the victim started staying away from her house, telling defendant she needed space. In July 2017, while the victim was away, defendant awoke to three men in his bedroom, two with guns and the other with a baseball bat. One of them put a gun to defendant's head, told him to leave, and warned that if he bothered the victim again he would be killed. Defendant believed this man was the victim's new boyfriend, Brandon. Defendant, shaken, grabbed his clothes and left. He contacted the victim, who denied knowing what happened. She told him not to call the police if he wanted her to return his belongings.

The next day, defendant met the victim to collect some belongings. The victim admitted one of the men was her new boyfriend and that they took some of his things. She said she was trying to get them back and purchased a hotel room for him. The victim later helped him find a new place to live. He moved into the new place on August 1, 2017. She continued to receive his mail and met him about every two weeks to give it to him.

In or around February 2018, the former couple agreed to meet on a Saturday, but she did not appear or answer her phone. Defendant called her once on Saturday and twice on Sunday. Finally, on Sunday, her new boyfriend, who sounded like the man with the gun, answered and told defendant he would kill defendant if he did not stop calling. Defendant hung up.

The next day, defendant contacted the victim and arranged to meet her at the store parking lot that evening. She arrived with her daughter. Bringing up the prior day's phone call, the victim told defendant it was a message from her boyfriend, who would kill defendant if he called again.

Defendant responded, "[I]f he come for me, then he's going to be gone," meaning her boyfriend would die if he came after defendant. After exchanging more words, he left.

Defendant denied threatening the victim, having a gun with him, demanding that she write down her new boyfriend's name, or preventing her from leaving. He also denied any of the prior acts of violence that the victim described and insisted there was no physical violence between them.

The victim called defendant two days after the store parking lot meeting. He suspected the call was being recorded and denied making threats toward her.

Defendant received his gun license in 2016 while living with the victim. They talked about his intention to buy a gun. In December 2017, after defendant bought the gun, he stored it in a locked box with the record of sale.

## III. *Rebuttal and Surrebuttal.*

The prosecutor played a February 7, 2018 pretext phone call the victim made to defendant. In this call, the victim said she was scared because defendant pulled a gun on her and threatened to kill her. Defendant denied knowing what she was talking about and said that, to move forward, she needed to return his stuff. Defendant accused Brandon of "run[ning] up on people with niggas with bats and, uh, get[ting] on the phone and talk[ing] reckless." Defendant warned the victim not to talk "reckless" and to choose her words "a little bit better." He invited the victim to dinner to talk, but she refused, asking how they could have dinner when he was threatening to kill her. He again denied knowing what she was talking about.

Defendant accused the victim of "lying to me the whole time" and "set[ting] me up" by having "[her] dude . . . come get me." The victim denied this. She said that she had to get someone else to ask him to leave because

6

he was refusing to do so. Defendant warned her that Brandon was " 'bout to be gone" and "[h]e's gone." Defendant asked if Brandon was "stayin' over there." Upset that the victim did not reach out to him after Brandon answered her phone, defendant said she was "lucky nothin' happen [*sic*] right then . . . ." Defendant also told her, "He gettin' at me through you."

Defendant testified in surrebuttal that he did not know why the victim was scared. At the store parking lot, defendant relayed the message that if the victim's boyfriend came to "see" or "kill" him, "he's going to be gone." He asked the victim if Brandon was staying with her because he believed she was lying when she said Brandon did not live with her. Defendant believed the pair began their relationship before he moved out. Defendant did not ask the victim to explain what she meant by saying he pulled out a gun and threatened to kill her. He told her to choose her words more carefully because he was frustrated and upset. He believed the call was being recorded or listened to by someone.

## IV. *Verdict, Sentencing and Appeal.*

On August 28, 2019, the jury found as to count 1 that defendant was guilty of making a criminal threat and that he did not personally use a firearm but that he was armed with a firearm when committing the offense. As to count 2, the jury found defendant not guilty of false imprisonment but guilty of the lesser included offense of attempted false imprisonment. At sentencing, the court placed defendant on probation for three years subject to terms and conditions, including serving 180 days in county jail. On September 21, 2020, defendant appealed.

## DISCUSSION

Defendant argues on appeal: (1) the court prejudicially misinstructed the jury on CALCRIM No. 1300 ("Criminal Threat") because there was

7

insufficient evidence to support it as given; (2) the court prejudicially erred in failing to sua sponte instruct on jury unanimity; (3) he received ineffective legal assistance when his attorney made "material misstatements" during summation (all capitalization and boldface omitted); and (4) newly amended section 1203.1 requires reducing his probationary term to two years. We address these arguments in turn.

## I. *No Prejudicial Error in Giving CALCRIM No. 1300.*

Defendant argues the court's giving of CALCRIM No. 1300, Criminal Threat, was prejudicial error because the evidence was insufficient to prove that (1) Brandon was a member of the victim's "immediate family" for purposes of section 422 or that (2) the victim was reasonably in sustained fear for her immediate family's safety. The following rules govern.

The trial court has a sua sponte duty to provide "proper instructions on all of the elements of the charged offenses." (*People v. Lewelling* (2017) 16 Cal.App.5th 276, 295.) An instruction is warranted where there is "some evidence in the record that, if believed by the jury, would sufficiently support the suggested inference." (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 102.) "It is error to give an instruction which, while correctly stating a principle of law, has no application to the facts of the case." (*People v. Guiton* (1993) 4 Cal.4th 1116, 1129 (*Guiton*).) We review the propriety of a trial court's instruction de novo. (*People v. Cole* (2004) 33 Cal.4th 1158, 1206.)

8

## A.     Factual Background.

The challenged instruction, CALCRIM No. 1300, sets forth the elements of count 1, making a criminal threat (§ 422).[3] This instruction[4] stated in relevant part:  "To prove that the defendant is guilty of this crime, the People must prove that: [¶] One, the defendant willfully threatened to unlawfully kill or unlawfully cause great bodily injury to [Jane Doe One] or members of complaining witness's immediate family; [¶] Two, the defendant made the threat orally or by electronic device or in writing; [¶] Three, the defendant intended that his statement be understood as a threat and intended that it be communicated to [Jane Doe One]; [¶] Four, the threat was so clear, immediate, unconditional and specific that it communicated to [Jane Doe One] a serious intention and the immediate prospect that the threat would be carried out; [¶] Five, the threat actually caused [Jane Doe One] to be in sustained fear for her own safety *or for the safety of her immediate family*; and [¶] Six, [Jane Doe One's] fear was reasonable under the circumstances. [¶] . . . [¶] *Immediate family means any spouse, parents and*

---

[3] "[T]o prove a violation of section 422, the prosecution must establish all of the following:  (1) that the defendant 'willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person,' (2) that the defendant made the threat 'with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out,' (3) that the threat . . . was 'on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat,' (4) that the threat actually caused the person threatened 'to be in sustained fear for his or her own safety or for his or her immediate family's safety,' and (5) that the threatened person's fear was 'reasonabl[e]' under the circumstances." (*People v. Toledo* (2001) 26 Cal.4th 221, 227–228.)

[4] The trial court record frequently refers to the victim as "Jane Doe One" and the victim's daughter as "Jane Doe Two."

*children, any grandchildren, grandparents, brothers and sisters related by blood or marriage or any person who regularly lives in the other person's household or who regularly lived there within the prior six months.*" (Italics added.)

During the jury instruction conference, defense counsel objected to the inclusion of the italicized language on the grounds that the victim's fear "for the safety of her immediate family" was not at issue. The court responded that it believed the victim testified she feared for the safety of her daughter and, "[G]iven her testimony, I'll go back and look at my notes, but I think this was within the scope of what she testified to." Defendant never renewed his objection, and the instruction with the italicized language was given.

During summation, the prosecutor discussed each element of count 1, explaining defendant made the criminal threat to the victim on February 5, 2018, when "[h]e told her he was going to kill her. That's a threat. He showed her a gun as he did so. He said, I want to kill you. I'm going to kill you. He threatened her more than one time with her life." The prosecutor continued, "[I]t doesn't really get more clear, immediate, unconditional, and specific than, I will kill you. I want to kill you." Afterward, "she called the family member first. She called her boyfriend first [before calling 911]." "And it actually caused her to be in sustained fear for her own safety or the safety of her immediate family. . . . [¶] . . . [¶] . . . [S]he didn't go home. She sped out of the parking lot. She called 911. . . . [¶] . . . She stayed at her uncle's house. . . . That is how frightened she was. That's how seriously she took what the defendant said to her. [¶] And, of course, she was terrified for her child. Confronted with a man who is showing her a gun and telling her he was going to kill her. Yeah, she was frightened for her daughter."

10

During deliberations, the jury sent a note to the court asking, "Is Brandon considered part of the family"? The court responded, "No." A few hours later, the jury sent another note to the court, stating, "Penal code 422 [¶] Immediate family item C page 2 see [and] return attached." The court responded, "You must rely on testimony/evidence produced during the trial to determine who was and/or who was not living in the household for purposes of instruction 1300."[5] Eventually, the jury reached a verdict, finding defendant guilty of count 1 and finding not true the allegation that he personally used a firearm in committing the crime but true that he was armed in doing so.

Defendant moved for a new trial, arguing (inter alia) that the jury improperly convicted him under section 422 of making a criminal threat against the victim's boyfriend, Brandon. Defendant submitted sworn declarations from juror Nos. 2 and 9, who asserted that they convicted defendant based upon a threat he made against Brandon and that the victim did not credibly testify that defendant was armed at the time. The court denied the motion and rejected the juror declarations, finding they contained mental processes that could not properly be considered.

## B. Legal Analysis.

Defendant contends the evidence did not support the language in CALCRIM No. 1300 requiring the threat to have actually caused the victim to be in sustained fear for her own safety or *the safety of her immediate family*.[6] Defendant reasons that, one, the victim never testified his threat

---

[5] Defendant asserts that the court's response to this jury question was erroneous but does not explain why. We therefore disregard his assertion.

[6] In the standard CALCRIM No. 1300 instruction, the italicized language is optional, as indicated by the brackets: "The threat actually caused _____ *<insert name of complaining witness>* to be in sustained fear for

11

caused her to be in sustained fear for her daughter's safety and, two, there was no evidence Brandon was an immediate family member, meaning that he regularly lived with her within the prior six months. According to defendant, the erroneous language contributed to the count 1 verdict. We conclude that even assuming error, there was no harm.

Initially, we agree the evidence is insufficient to prove that, based on defendant's threat, the victim was reasonably placed in fear for her daughter's safety. (*People v. Cole, supra*, 33 Cal.4th at p. 1206.) Section 422 requires that "the threat must be communicated to the complaining witness and cause the complaining witness to be in a state of sustained fear. However, this threat, directed toward the complaining witness, must be to unlawfully kill or cause great bodily injury to *either* the complaining witness *or* his or her immediate family member." (*Ayala v. Superior Court* (2021) 67 Cal.App.5th 296, 303.) The only evidence at trial was that defendant pulled a gun from his pocket and, without pointing it at the victim, threatened to kill her. While the victim testified that she feared for her daughter's safety, there was no evidence defendant threatened to harm her daughter, who was waiting in a nearby car.

Nonetheless, we conclude it is not reasonably probable the result would have been more favorable to defendant had the error not occurred. (*Guiton, supra*, 4 Cal.4th at p. 1130.) The California Supreme Court instructs, "In determining whether there was prejudice, the entire record should be examined, including the facts and the instructions, the arguments of counsel, any communications from the jury during deliberations, and the entire verdict. [Citation.] Furthermore, instruction on an unsupported theory is

_____

(his/her) own safety [or for the safety of (his/her) immediate family]."
(CALCRIM No. 1300.)

12

prejudicial only if that theory became the sole basis of the verdict of guilt; if the jury based its verdict on the valid ground, or on both the valid and the invalid ground, there would be no prejudice, for there would be a valid basis for the verdict. We thus adopt the following test. . . . [T]he appellate court should affirm the judgment unless a review of the entire record affirmatively demonstrates a reasonable probability that the jury in fact found the defendant guilty solely on the unsupported theory." (*Ibid*.)

Here, ample evidence supported the prosecutor's valid theory that defendant, armed with a gun, threatened to kill the victim in the store parking lot on February 5, 2018, and thereby placed her in sustained fear for her own life. The victim testified to these precise facts, which were then corroborated by the recording of the 911 call she made just after the incident. Her daughter's testimony was also aligned, as it confirmed the victim returned to the car on February 5, after having what looked like a stressful interaction with defendant, and told her daughter that defendant pulled out a gun and threatened to kill her. As such, there was no prejudice, as we may assume the unsupported theory that the victim was in fear for her daughter's safety was not "the sole basis of the verdict of guilt." (*Guiton, supra*, 4 Cal.4th at p. 1130; see *People v. Penunuri* (2018) 5 Cal.5th 126, 169 [reviewing court will not overturn a jury verdict absent an affirmative showing of a reasonable probability the defendant was convicted on the invalid theory].)

This same record defeats defendant's claim that the jury improperly convicted him of making a criminal threat against the victim's boyfriend, Brandon. The prosecutor never raised this theory at trial.[7] Further, in

---

[7] As defendant mentions, the prosecutor referred to Brandon as the victim's "family member" in summation. The prosecutor did so just one time,

13

finding defendant guilty, the jury found true that he was armed while committing the crime. The only evidence of defendant's being armed was on February 5, 2018, in the store parking lot. The victim's testimony, corroborated by the 911 call, made clear that defendant threatened to kill her, and no one else, on February 5. Thus, as before, the jury verdict stands because defendant cannot affirmatively show a reasonable probability that he was convicted on the invalid theory that he made the threat against Brandon. (*Guiton, supra*, 4 Cal.4th at p. 1130; *People v. Penunuri, supra*, 5 Cal.5th at p. 169.)

Finally, defendant's attempt to rely on juror declarations to prove otherwise fails. The trial court found these declarations contained improper evidence relating to the jurors' mental processes, which were inadmissible to impeach the verdict. Defendant makes no attempt to prove the court's finding was erroneous. Nor could he. The California Supreme Court has long held that " ' "[a] verdict may not be impeached by inquiry into the juror's mental or subjective reasoning processes, and evidence of what the juror 'felt' or how he understood the trial court's instructions is not competent. ([Citations]; Evid. Code, § 1150, subd. (a).)" ' " (*People v. Lindberg* (2008) 45 Cal.4th 1, 53.) We thus agree with the court that the jurors' declarations should not be considered.

---

in explaining that after being threatened by defendant, the victim called Brandon before she called the police. Yet, in explaining each element of count 1, the prosecutor made clear the criminal threat was directed at the victim, not Brandon. Moreover, when the jury asked the court during deliberations whether Brandon was the victim's family member, the court responded, "No." On this record, the court's reference to Brandon as a "family member" could not have confused the jury while it was deliberating on count 1.

**II.** *No Sua Sponte Duty to Instruct on Juror Unanimity.*

"In a criminal case, 'the jury must agree unanimously the defendant is guilty of a *specific* crime.' " (*People v. Covarrubias* (2016) 1 Cal.5th 838, 877–878 (*Covarrubias*).) Defendant contends the court prejudicially erred in this case by failing to instruct on jury unanimity. He reasons that jurors could have found him guilty of making a criminal threat based on either a threat he made against the victim or a threat he made against Brandon. We consider de novo whether a unanimity instruction should have been given in a particular case. (*People v. Hernandez* (2013) 217 Cal.App.4th 559, 568.) Having done so, we reject his argument.

" '[C]ases have long held that when the evidence suggests more than one discrete crime, either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act.' [Citation.] Yet 'where the evidence shows only a single discrete crime but leaves room for disagreement as to exactly how that crime was committed or what the defendant's precise role was, the jury need not unanimously agree on the basis or, as the cases often put it, the 'theory' whereby the defendant is guilty.' [Citation.] 'In deciding whether to give the instruction, the trial court must ask whether (1) there is a risk the jury may divide on two discrete crimes and not agree on any particular crime, or (2) the evidence merely presents the possibility the jury may divide, or be uncertain, as to the exact way the defendant is guilty of a single discrete crime. In the first situation, but not the second, it should give the unanimity instruction.' [Citation.]" (*Covarrubias, supra*, 1 Cal.5th at pp. 877–878.)

Our case comports with the second situation: The evidence merely presents the possibility the jury was uncertain as to the exact way defendant was guilty of making a criminal threat. Indeed, the case built against

15

defendant from start to finish was based on his threat directed at the victim, to kill her. Defendant was charged with making a criminal threat against the victim; the victim testified unequivocally that defendant threatened her; and the prosecutor argued to the jury the basis for count 1 was the threat defendant made against the victim. Thus, while Brandon may have triggered the threat, he was not its target. Accordingly, the court was not required to give a unanimity instruction. (*Covarrubias, supra*, 1 Cal.5th at p. 878.)

Further weighing against the need for a unanimity instruction is the fact that the jury found defendant was armed while making the criminal threat. The only evidence at trial supporting this finding related to the February 5, 2018 incident at the store parking lot. There is no evidence of any threat being waged against Brandon during this incident. On the contrary, as explained *ante*, the evidence proved that on February 5, 2018, defendant showed the victim his gun and threatened to kill her. The jury's verdict therefore implies jurors were not divided on the crime defendant committed. Rather, they agreed he made a criminal threat, while armed, against the victim. Thus, no unanimity instruction was necessary. (See *Covarrubias, supra*, 1 Cal.5th at p. 878.)

## III.  *No Ineffective Assistance of Counsel.*

Defendant next argues that his attorney violated his right to effective assistance from counsel by making material misstatements in summation. Specifically, defendant faults his counsel for twice stating, " 'As soon as [defendant] moved out, Brandon moved in.' " According to defendant, his attorney's statements "would have . . . misled [one or more jurors] in assessing whether or not Brandon was a member of [the victim's] 'immediate family' 'who within the prior six months, regularly resided in the household.' (§ 422, subds. (a), (b).)" In addition, defendant contends—without any

explanation—that his attorney's statements served to lessen the prosecution's burden of proof and erode jurors' confidence in the strength of his case.

To prevail on a claim of ineffective assistance of counsel, the "defendant must show counsel's performance fell below a standard of reasonable competence, and that prejudice resulted." (*People v. Anderson* (2001) 25 Cal.4th 543, 569.) "Prejudice" in this context occurs only where defense counsel's deficient performance " 'so undermined the proper functioning of the adversarial process' " that the outcome cannot be deemed reliable. (*People v. Kipp* (1998) 18 Cal.4th 349, 366, quoting *Strickland v. Washington* (1984) 466 U.S. 668, 686 (*Strickland*).)

Under this standard, defendant must overcome a strong presumption that his counsel's conduct was sound legal strategy or otherwise within the wide range of reasonable professional assistance. (*People v. Bunyard* (1988) 45 Cal.3d 1189, 1215.) "Defendant's burden is difficult to carry on direct appeal, as we have observed: ' "Reviewing courts will reverse convictions [on direct appeal] on the ground of inadequate counsel only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for [his or her] act or omission." ' [Citation.]" (*People v. Lucas* (1995) 12 Cal.4th 415, 437 (*Lucas*).) Moreover, if "defendant has failed to show that the challenged actions of counsel were prejudicial, [we] may reject the claim on that ground without determining whether counsel's performance was deficient." (*People v. Kipp, supra*, 18 Cal.4th at p. 366.)

Here, the record does not disclose why defendant's counsel twice stated that Brandon moved in as soon as defendant moved out. We therefore reverse only if there is no rational tactical reason for his counsel's conduct. (*Lucas, supra*, 12 Cal.4th at p. 437.) This standard is not met here.

17

First, in light of the strong presumption of reasonableness attaching to the attorney's actions, we conclude the challenged statements were fair comments on the evidence. (See *People v. Ledesma* (2006) 39 Cal.4th 641, 748 ["mere circumstance that a different, or better, argument could have been made is not a sufficient basis for finding deficient performance"].) Although the victim did not testify that she regularly lived with Brandon, she did testify that soon after defendant left, "[Brandon] had stuff at our house, like jackets and sometimes shoes," and sometimes stayed over for a few days.

Moreover, it cannot be said "no rational tactical reason" existed for defense counsel's statements. (*Lucas, supra*, 12 Cal.4th at p. 437.) His defense was premised on the victim's relationship with Brandon. Among other things, he claimed the victim lied about the fact that Brandon kicked him out of her house while armed with a gun and threatened to kill him if he bothered her again. Defendant also explained that when, during the pretext phone call, he told the victim Brandon was "going to be gone," he meant that if Brandon came after him, defendant would respond. Given defendant's testimony, his counsel had a tactical reason to point out that Brandon moved in with the victim around the same time defendant was moving out.

In any event, as mentioned, the *Strickland* standard has two prongs: deficient performance by counsel and prejudice. (*People v. Kipp, supra*, 18 Cal.4th at p. 366.) Here, we presume the jury followed the court's instructions that, one, "[n]othing that the attorneys say is evidence" and, two, the prosecution had the burden to prove the making of a criminal threat by proof beyond a reasonable doubt. (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 853.) While defendant claims the jury likely held the prosecutor to a lesser burden based on his counsel's statements, he offers no supportive

evidence. Thus, even if we assume counsel misspoke, on this record there was no harm. (*Strickland, supra*, 466 U.S. at p. 686.)

## IV. *The three-year probationary period stands.*

In supplemental briefing, defendant argues Assembly Bill No. 1950 applies retroactively to his case and requires reducing his probationary term to two years. He is wrong.[8]

After sentencing, the Legislature passed Assembly Bill No. 1950, which amended section 1203.1 as of January 1, 2022, to limit to two years the maximum period of probation for most felonies. (§ 1203.1, subd. (a), as amended by Stats. 2020, ch. 328, § 2, No. 5B Deering's Adv. Legis. Service, p. 58.) However, there are exceptions to this limit, including where, as here, the underlying offense involves domestic violence. Specifically, the new version of section 1203.1 states that the "two-year probation limit in subdivision (a) shall not apply to: [¶] (1) An offense listed in subdivision (c) of Section 667.5 and *an offense that includes specific probation lengths within its provisions.* For these offenses, the court, or judge thereof, in the order granting probation, may suspend the imposing or the execution of the sentence and may direct that the suspension may continue for a period of time not exceeding the maximum possible term of the sentence and under conditions as it shall determine. All other provisions of subdivision (a) shall apply." (§ 1203.1, subd. (*l*)(1), italics added.)

---

[8] The parties agree the amended version of section 1203.1 applies retroactively as an ameliorative change in the law applicable to all nonfinal convictions on appeal. (*People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, 308.) We agree, too. (*People v. Faial* (2022) 75 Cal.App.5th 738, 743 ["Appellate courts are so far unanimous in holding that Assembly Bill 1950 applies retroactively to defendants who were serving a term of probation when the legislation became effective on January 1, 2021"].)

Here, defendant's crimes are subject to a specific probation length of three years. Under Penal Code section 1203.097: "If a person is granted probation for a crime in which the victim is a person defined in Section 6211 of the Family Code, the terms of probation shall include . . . : [¶] (1) A minimum period of probation of 36 months, which may include a period of summary probation as appropriate." (§ 1203.097, subd. (a)(1).) Family Code section 6211, in turn, defines " 'domestic violence' " as "abuse perpetrated against . . . : [¶] . . . [¶] (c) [a] person with whom the respondent is having or has had a dating or engagement relationship." (Fam. Code, § 6211, subd. (c).) "Section 1203.097 applies to any person placed on probation for a crime *if the underlying facts of the case involve domestic violence*, even if the statute defining the crime does not specifically refer to domestic violence." (*People v. Cates* (2009) 170 Cal.App.4th 545, 548.)

Applying this statutory scheme, defendant is subject to three years (36 months) of probation because he committed crimes of abuse against the victim, a person with whom he had a dating relationship. (Pen. Code, §§ 1203.1, subd. (*l*), 1203.097, subd. (a)(1); Fam. Code, § 6211, subd. (c).) Assembly Bill No. 1950 thus provides no basis for reducing his probationary term.

## DISPOSITION

The judgment is affirmed.

_____
Jackson, P. J.

WE CONCUR:


_____
Simons, J.


_____
Wiseman, J.*

A161024/*People v. Phillip Marte Rollins*

---

* Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.